# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Barbara Gosselin, Trustee for the Living Trust of Clarence K. Shuey, | : : : | |
| Appellant | : : | |
| v. | : : | No. 531 C.D. 2018 Argued: November 13, 2019 |
| The Supervisors of North Manheim Township, Schuylkill County, Pennsylvania | : : : : | |

BEFORE:    HONORABLE MARY HANNAH LEAVITT, President Judge[1]
                HONORABLE RENÉE COHN JUBELIRER, Judge
                HONORABLE P. KEVIN BROBSON, Judge
                HONORABLE PATRICIA A. McCULLOUGH, Judge
                HONORABLE ANNE E. COVEY, Judge
                HONORABLE MICHAEL H. WOJCIK, Judge
                HONORABLE CHRISTINE FIZZANO CANNON, Judge

**OPINION NOT REPORTED**

**MEMORANDUM OPINION BY**
**JUDGE COHN JUBELIRER**          **FILED: May 28, 2021**

This appeal requires that we interpret a restrictive covenant on a 35-year-old subdivision plan, which states that "Lots 1, 2 and 5" (the Lots) will not be sold before the installation of roadways and storm water management improvements. Where the entire 56.7-acre tract of land (the Parcel), which includes the Lots and an almost

---

[1] This case was assigned to the opinion writer before Judge Brobson succeeded Judge Leavitt as President Judge.

50-acre residue, would be transferred as one tax parcel, we must determine whether the owner is required to first install the roadways and storm water management improvements. After careful review, in light of the particular facts of this case and the context in which the restrictive covenant arose, and strictly construing the restriction against the party seeking its enforcement, as we must, we find that requiring the roadways and improvements to be built will not further the purpose of the restrictive covenant and is unreasonable. We therefore reverse the trial court.

## I. BACKGROUND

Barbara Gosselin, Trustee (Trustee) for the Living Trust (Trust) of Clarence K. Shuey (Shuey), appeals from the Schuylkill County Common Pleas Court's (trial court) March 14, 2018 Order granting the Supervisors of North Manheim Township's (Township) cross-motion for summary judgment (Township's Motion) and denying Trustee's summary judgment motion (Trustee's Motion). Shuey[2] created the Trust on October 4, 2000. The last non-cash asset is the Parcel, which was originally part of a 65-acre tract of land, located in North Manheim Township, Schuylkill County. In 1986, the Township approved the Subdivision Plan submitted by Shuey and his wife (the Shueys), seeking to subdivide a portion of the 65-acre tract into five smaller lots for an industrial park as follows: Lot No. 1 – 1.5 acres; Lot No. 2 – 1.88 acres; Lot No. 3 – 4.34 acres; Lot No. 4 – 4.02 acres; and Lot No. 5 – 3.33 acres.[3] (Trial Court's Findings of Fact (FOF) ¶ 9; Reproduced Record

---

[2] Shuey died on December 31, 2005.
[3] There exists a slight discrepancy in the stated lot sizes between those in the trial court's Findings of Fact and those in the Subdivision Plan. The Subdivision Plan describes the lot sizes as: Lot No. 1 – 1.53 acres; Lot No. 2 – 1.88 acres; Lot No. 3 – 4.34 acres; Lot No. 4 – 4.03 acres; and Lot No. 5 – 3.37 acres. (Reproduced Record at 218a.)

2

(R.R.) at 185a.[4])   The Subdivision Plan did not address the remaining acreage (Residue).  Lot Nos. 3 and 4, which were subsequently sold and developed, have access to a public roadway, which runs adjacent thereto.  (R.R. at 218a.)  Lot Nos. 1, 2, and 5 do not have direct access to an existing public roadway.  According to the Township Secretary, in an attempt to remedy the access issue and to prevent any resulting runoff, a Note was added to the Subdivision Plan.  The Note, which Shuey accepted, states, "Lots 1, 2 and 5 will not be sold prior to the installation of the proposed roadway shown hereon and the associated storm water management required to facilitate the roadway drainage in accordance with the latest . . . Township Zoning and Subdivision Ordinance." (*Id*. at 218a.)  The Lots are located on the edge of the Parcel, and one of the proposed roadways, running north to south, appears to bisect Lot Nos. 1 and 2 from Lot No. 5, while the other proposed roadway, running east to west, appears to bisect Lot No. 1 from Lot No. 2.  (*Id.* at 217a-18a.)  In 1999, the Shueys transferred the Parcel to a revocable trust.  In 2001, the Parcel was transferred from the revocable trust to the Trust, and the Township did not enforce the Note during either of those transfers.  The Lots have otherwise never been sold or separated from the Parcel and remain part of the Parcel, which is taxed as one entity.

In 2013, Trustee informed the Township that she was attempting to sell the entire Parcel, which consists of the Lots and the Residue.  The Township responded that it interpreted the Note as prohibiting the sale of the Lots, whether individually

---

[4] Although Rule 2173 of the Pennsylvania Rules of Appellate Procedure, Pa.R.A.P. 2173, requires the reproduced record to be numbered in Arabic figures followed by a small "a," the Reproduced Record here only utilizes Arabic figures.  We cite to the Reproduced Record in the proper format.

or as part of the Parcel, until the Trust installed the proposed roadways and the associated required storm water management improvements.

On June 30, 2014, Trustee filed a complaint in the trial court and subsequently filed an Amended Complaint on January 29, 2015, seeking a declaration that the Note only requires construction of the proposed roads and accompanying storm water management if the Lots are to be sold separately from the Parcel.[5] Therein, Trustee alleged that the Trust needs to sell the Parcel so that it can distribute the cash value to the Trust's beneficiaries, who ranged in age from 76 to 85 years old at the time of the Amended Complaint, and one of whom had already died.[6] (Amended Complaint (Am. Compl.) ¶¶ 15-17.) According to the Amended Complaint, the Trust has faced hardship in its attempts to sell the Parcel, as the Township's position "has had the effect of chilling the sale of the property," (*id.* ¶ 21), because prospective buyers have all "lost interest in purchasing the property after" learning of the Township's interpretation of the Note, (*id.* ¶ 18).[7] Trustee estimated that paving the road and making the associated storm water improvements under the restrictive covenant would cost the Trust at least $180,000. (*Id.* ¶ 12.)

After the pleadings closed and following discovery, Trustee and the Township filed their respective Motions, which were filed in lieu of a bench trial. (Trial Court's March 14, 2018 Opinion (Op.) at 1; R.R. at 183a.) On March 4, 2018, the trial court

---

[5] In the Amended Complaint, Trustee also brought a claim for monetary damages against the Township for intentional interference with contractual and prospective contractual relations. This count was dismissed based upon the Township's preliminary objections. Trustee does not challenge the dismissal of this count on appeal.

[6] This beneficiary's share of the Trust was left to her five children.

[7] Trustee averred in the Amended Complaint that she received a written offer to purchase the Parcel as recently as October 2014, but the offer was contingent upon "resolution of installation of road issue . . . so that [prospective purchaser] . . . could buy [the] entire [] [P]arcel and [not] be responsible to install road, unless he was to sell [L]ots 1, 2 or 5 separately." (Am. Compl. ¶ 20(K) (quoting written offer).)

4

granted the Township's Motion and denied Trustee's Motion, determining that "the Note . . . restricts the sale of [the Lots] . . . individually or as part of [the Parcel] without the installation of the proposed roadways and the associated storm water management in compliance with the . . .Township Ordinance." (Trial Court's Order, R.R. at 182a.) The trial court found that the Township Secretary testified in her deposition that, at the time the Subdivision Plan was approved in 1986, "she understood that the Note required the road to enable access to the properties of the public road and required storm water management to prevent runoff." (FOF ¶ 17.) Specifically, the Township Secretary testified that "the reason the road would be installed would be to access the other properties . . . that would come off that road" and that "[s]torm[]water improvements would be installed to prevent soil and erosion problems . . . ." (Supplemental Reproduced Record (S.R.R.) at 64b-65b.) The Township Secretary also testified that the property was last listed at $250,000. (*Id*. at 14b.)

> In explaining the rationale for its decision, the trial court stated the following:

> [W]e find that the language in the Note is clear and unambiguous. We, therefore, need not address evidence outside the four corners of the document as to the "subject matter, the intent or purpose of the parties and the conditions surrounding execution of the covenant". In any event, upon review of the exhibits and affidavits, we have found little admissible or relevant information that would assist us in interpreting the Note. Further, the parties did not dispute that the subdivision of . . . [the Lots] was completed and, therefore, we do not find it relevant that they remain part of one tax parcel, along with the [R]esidue. Thus, we find that the language in the Note restricts the [] Trust from selling . . . [the Lots] until it completes the stated improvements. The [] Trust cannot sell . . . [the Lots] as part of a larger [P]arcel to circumvent the restrictions placed in the Note. The Trust's settlor and predecessor in title, [Shuey,] agreed to the Note and it is binding upon the [] Trust.

5

(Trial Court's March 14, 2018 Op. at 8-9, R.R. at 190a-91a.) In its Opinion issued pursuant to Pennsylvania Rule of Appellate Procedure 1925(a), Pa.R.A.P. 1925(a), (Rule 1925(a) Op.), responding to Trustee's argument that the trial court had impermissibly expanded the Note in denying Trustee's Motion, the trial court added that "[t]he sale of [the Lots] . . . as part of . . . [the Parcel] is still the sale of [the Lots]." (Rule 1925(a) Op. at 4, R.R. at 213a.) The trial court further found that it did not need to address Trustee's allegation that there were material facts in dispute, as the trial court found those alleged facts to pertain to who drafted the Note, and, because the trial court found the Note unambiguous, it determined it unnecessary to reach this issue. Trustee appealed the trial court's decision to this Court.[8]

## II. PARTIES' ARGUMENTS

Trustee contends that the trial court abused its discretion and/or erred as a matter of law when it denied Trustee's Motion and granted the Township's Motion based on the trial court's conclusion that the Note requires the road installation and storm water improvements to occur before the Parcel can be transferred as a single 56.7-acre parcel. Trustee argues that the Note "speaks for itself," in that its plain words do not prohibit Trustee from transferring the Parcel as one tract of land before making the road and storm water improvements. (Trustee's Brief (Br.) at 19.) To support this position, Trustee points to the fact that the Parcel was already transferred to the Shueys' revocable trust in 1999 and then to the Trust in 2001 without any action taken by the Township requiring the road be paved and the storm water improvements implemented. Therefore, Trustee asserts that the Note only requires

---

[8] "This Court's review of a trial court's order granting or denying a motion for summary judgment is limited to determining whether the trial court committed an abuse of discretion or an error of law." *Sacco v. Twp. of Butler*, 863 A.2d 611, 613 (Pa. Cmwlth. 2004).

6

the installation of the road and storm water improvements before the Lots, or any combination of the same, are sold separate from the Parcel. Trustee argues that the trial court erred by failing to strictly construe the Note against the Township because such restrictive covenants are disfavored by the law due to their interference with the rights of landowners to freely alienate their property and by not resolving any ambiguity in the Note in Trustee's favor. Further, Trustee argues that the trial court impermissibly enlarged the Note by adding language that did not exist. Finally, Trustee asserts that, with respect to the Township's Motion, there are material facts in dispute regarding who drafted the Note and whether the Lots exist as separate taxable entities from the Parcel, facts that the trial court relied upon in making its decision. Accordingly, the Trust asks this Court either to reverse the trial court's order and require the trial court to grant Trustee's Motion or, in the alternative, to vacate the trial court's order granting the Township's Motion and order the matter to proceed to trial.

The Township argues that the trial court correctly determined that the Note's language was unambiguous and that the trial court properly gave plain meaning to the clear words of the Note in finding that it prohibited the sale of the Lots either separately from the Parcel or as part of the Parcel without the improvements first being made. The Township posits that

> [a] logical reading of the [N]ote and the one most consistent with the law is that the agreement allowed the sales of Lot[] [Nos.] 3 and []4 without restriction with the proviso and [in] exchange for the clear right to enforce the restriction against any type of sale of the remaining lots unless the required roads were completed first.

(Township's Br. at 19.) The Township asserts that it has the right to impose restrictions accepted by the parties to the covenant and that the Trust's failure to

7

previously challenge the Note results in a waiver under *Doylestown Township v. Teeling*, 635 A.2d 657 (Pa. Cmwlth. 1993), which held that a subdivider's "failure to object to restrictive conditions constituted a waiver of the right to seek review." (Township's Br. at 13 (citing *Doylestown*, 635 A.2d at 660).) The fact that the Parcel and the Lots continue to have only one tax identification number, the Township submits, is immaterial to whether the restriction is enforceable on the Lots. And because the previous transfers from the Shueys to the revocable trust and then from the revocable trust to the Trust are not taxed, the Township argues that it was not aware of these transfers at the time and, therefore, had no occasion to enforce the Note at those times. Further, the Township asserts that who requested the Note is not material for this determination. Finally, the Township argues that Trustee's suit is barred by governmental immunity under what is commonly referred to as the Political Subdivision Tort Claims Act (PSTCA), 42 Pa.C.S. §§ 8541-8542, and that the Township's Supervisors are protected by qualified immunity, high public official immunity, and official immunity.

Prior to oral argument, this Court ordered the parties to submit supplemental briefs addressing certain questions.[9] In her supplemental brief, Trustee argues that

---

[9] The Court ordered the parties to file supplemental briefs addressing the following issues: (1) Are lots created and do they legally exist when a final subdivision plan is approved and recorded? If not, when are they created and legally in existence? (2)(a) What is the effect, if any, of the Note on the creation or legal existence of the Lots? (2)(b) Is the Note a condition of subdivision approval that was agreed to by the Shueys? (3) What effect, if any, does the prior sale of lots 3 and 4 have on the creation or legal existence of the Lots? (4) What effect, if any, does the length of time, being more than 30 years, between the approval/recording of the Subdivision Plan and the attempt to sell the Lots have on the Subdivision Plan and the Note? Does the sale of lots 3 and 4 affect this analysis? (5) What effect, if any, does the fact that the Lots do not have separately recorded deeds or tax parcel identification numbers have on the determination of their creation or legal existence? (6) If the Lots are legally in existence and are all sold with the Residue to the same buyer, will the sale be considered a separate sale of each lot? If so, does this separate
**(Footnote continued on next page…)**

8

(1) the Lots do not legally exist from the approval and recording of a final subdivision plan because they have not been separated from the Parcel and are not taxed separately; (2) the Shueys' agreement to the restriction is not material for its enforcement; (3) the prior sale of Lot Nos. 3 and 4 had no effect on the legal existence of the Lots; (4) the passage of time since the Subdivision Plan's recording bars the Township from enforcing the Note under the doctrine of laches; (5) the Lots have no separate tax parcel identification number, which means the Lots have not been created; and (6) the subsequent note following the Note at issue on the Subdivision Plan, which states that "each individual lot purchaser will be responsible for [its] own storm water management in accordance with the latest . . . Township Subdivision Ordinances," (R.R. at 218a), does not affect this Court's interpretation.

In its supplemental brief, the Township argues that (1) lots are legally created upon approval and recording of a subdivision plan; (2) the Lots cannot be sold separately from the Parcel under the Note absent the implementation of the improvements in the Note first; (3) the Shueys' acceptance of the Note and the Trust's lack of objection to the Note over the past 30 years blocks the present challenge to the Note's enforcement; (4) the fact that the Lots do not have separate tax parcel identification numbers does not affect this Court's analysis; and (5) the previous transfers to and between the trusts were not taxable and, therefore, the

sale, albeit to the same buyer, trigger the Trust's obligations pursuant to the Note to make the road and storm water improvements prior to the sale?  How does a sale to the same buyer of the Lots, even if considered separate sales, impact the purposes behind the Note, which, the Township Secretary testified, are to increase access and to mitigate any runoff with the creation of new roads?  (7) Should our interpretation of the Note regarding the installation of road and storm water improvements be influenced by the note immediately following the Note, which uses the phrase "individual lot purchaser," in that it suggests that the Township and the Shueys operated under the belief that the storm water improvements would be necessary when the Lots would be sold to individual purchasers?  (April 11, 2019 Order.)

9

Township was not aware of the transfers and thus lacked the opportunity to enforce the Note at those times.

## III. ANALYSIS

A motion for summary judgment "is properly granted where there is no genuine issue of material fact as to a necessary element of a cause of action and the moving party has clearly established entitlement to judgment as a matter of law." *LaChance v. Michael Baker Corp.*, 869 A.2d 1054, 1056 n.3 (Pa. Cmwlth. 2005). For the purposes of summary judgment, "[a] fact is material only if it directly affects the disposition of the case." *Pyeritz v. Commonwealth*, 956 A.2d 1075, 1079 (Pa. Cmwlth. 2008) (citing *Allen v. Colautti*, 417 A.2d 1303 (Pa. Cmwlth. 1980)).

### A. Waiver

As an initial matter, the Township argues that the Trust waived the right to challenge the Note by accepting the Note's inclusion in the Subdivision Plan without objection. In *Bonner v. Upper Makefield Township*, 597 A.2d 196, 214 (Pa. Cmwlth. 1991), we explained that the acceptance of a subdivision plan's condition without objection constitutes a waiver to the future challenge to the **validity** of the condition. *See also Doylestown*, 635 A.2d at 660. In the present case, however, while it is undisputed that Shuey accepted the Note's condition, Trustee is not presently challenging the **validity** of the Note in the Subdivision Plan. Rather, Trustee is challenging the Township's and the trial court's **interpretation** of the Note and whether the Note is implicated by the sale of the Lots and the Parcel as one single tract of land. Accordingly, the Township's waiver argument is inapplicable.

10

*B. Immunity*

The Township also raises several immunity arguments, which the Court next considers. Section 8541 of the PSTCA provides that "[e]xcept as otherwise provided in this subchapter, no local agency shall be liable for any damages on account of any injury to a person or property caused by any act of the local agency or an employee thereof or any other person." 42 Pa.C.S. § 8541. We have explained that "[t]his immunity applies both to damages claims and to claims for injunctive relief that require the government agency to take affirmative action to make physical alterations to property." *Plaza v. Herbert, Rowland & Grubic, Inc.* (Pa. Cmwlth., No. 344 C.D. 2016, filed Jan. 30, 2017), slip op. at 7 (citing *Swift v. Dep't of Transp.*, 937 A.2d 1162, 1168 & n.7 (Pa. Cmwlth. 2007)).[10] In the present case, Trustee is not seeking damages, as Trustee's damages claim was dismissed following the Township's Preliminary Objections, or injunctive relief that would require the Township to take any affirmative action to make physical alterations to the Lots or the Parcel. Instead, Trustee seeks declaratory judgment as to the proper interpretation of the Note and the applicability of the Note to a sale of the Parcel as a whole. The Township is thus not immune on this basis.

The Township also argues that its Supervisors are immune from suit on the bases of qualified immunity and high public official immunity. "The doctrine of qualified immunity has been applied in actions against government officials alleging the violation of rights guaranteed under the United States Constitution." *Lancie v. Giles*, 572 A.2d 827, 829 (Pa. Cmwlth. 1990). *See also Salerno v. Corzine*, 449 F. App'x 118, 123 (3d Cir. 2011) ("[I]t is well established that qualified immunity does

---

[10] Unreported decisions of this Court, while not binding, may be cited for their persuasive authority pursuant to Pennsylvania Rule of Appellate Procedure 126(b)(2), Pa.R.A.P. 126(b)(2), and Section 414(a) of this Court's Internal Operating Procedures, 210 Pa. Code § 69.414(a).

11

not bar actions for prospective relief, such as an injunction or declaratory judgment."); *Hill v. Borough of Kutztown*, 455 F.3d 225, 244 (3d Cir. 2006) (explaining that qualified immunity does not defeat a plaintiff's due process claim to the extent the plaintiff requests a name-clearing hearing because qualified immunity is available only for damages, not for claims requesting prospective injunctive or declaratory relief). Similarly, our Supreme Court has explained that

> [t]he doctrine of absolute privilege for high public officials . . . is unlimited and exempts a high public official from all civil suits **for damages arising out of false defamatory statements and even from statements or actions motivated by malice**, provided the statements are made or the actions are taken in the course of the official's duties or powers and within the scope of his authority . . . .

*Lindner v. Mollan*, 677 A.2d 1194, 1195-96 (Pa. 1996) (emphasis added). Here, however, regarding the Township's immunity argument under Section 8541, Trustee is not seeking damages against the Supervisors, as the trial court dismissed Trustee's sole claim for damages. Nor is Trustee alleging any claims arising under the United States Constitution or out of defamatory statements by the Supervisors, and, therefore, both of these immunity defenses are inapplicable.

The Township's final immunity argument is that the Supervisors have official immunity under *Hafer v. Melo*, 502 U.S. 21 (1991). However, *Hafer* pertained to suits brought under 42 U.S.C. § 1983. Accordingly, this Court does not find *Hafer* to be persuasive authority on this matter. Regardless, assuming that the Township is arguing official immunity under 1 Pa.C.S. § 2310,[11] our Supreme Court has explained that "[a]lthough declaratory relief does affirmatively affect the

---

[11] 1 Pa.C.S. § 2310 states, in relevant part, that "the Commonwealth, and its officials and employees acting within the scope of their duties, shall continue to enjoy sovereign immunity and official immunity and remain immune from suit . . . ."

12

functioning of state officials administering our statutory law, it does not directly compel an affirmative act." *Fawber v. Cohen*, 532 A.2d 429, 434 (Pa. 1987). Therefore, the Supreme Court held that the same reasoning applies to suits seeking declaratory relief under the Declaratory Judgments Act,[12] which it held are not barred under official immunity. *Id.* We are, therefore, not persuaded by Township's official immunity argument.

## C. The Note

While it is well settled that restrictive covenants are enforceable, they are not favored by the law in this Commonwealth. *See Doylestown*, 635 A.2d at 660; *Lauderbaugh v. Williams*, 186 A.2d 39, 41 (Pa. 1962) (explaining that restrictive covenants are "not favored in the law" because they restrain the right to freely alienate one's land). In *Doylestown*, we examined an unambiguous restrictive covenant that restricted further subdividing of the property at issue. We explained that

> [a] restrictive covenant is a restriction in an instrument relating to real estate by which the parties pledge that something will not be done . . . . **Such covenants are said to run with the land,** when not only the original parties or their representatives, but each successive owner of the land, will be entitled to its benefit, or be liable (as the case may be) to its obligation. **Although restrictive covenants are not favored by the law and are strictly construed against those seeking to enforce them,** they are legally enforceable. **Restrictive covenants are construed in light of the subject matter [and] the intent or purpose of the parties and the conditions surrounding execution of the covenant** . . . .

---

[12] 42 Pa.C.S. §§ 7531-7541. Section 7541(a) indicates that the purpose of the Declaratory Judgment Act is to "settle and afford relief from uncertainty and insecurity with respect to rights, status, and other legal relations, and is to be liberally construed and administered." 42 Pa.C.S. § 7541(a).

635 A.2d at 661 (internal citations and quotations omitted; emphasis added). Thus, in reviewing the enforceability of a restrictive covenant, whether ambiguous or not, this Court must consider the intent of the parties and the conditions surrounding its execution while strictly construing its terms against the party seeking its enforcement.

In interpreting the intent of the parties to a restrictive covenant and the restriction's terms, restrictive covenants are governed by the same rules as interpretation of a contract. *Great Atl. & Pac. Tea Co. v. Bailey*, 220 A.2d 1, 2-3 (Pa. 1966). "It is a fundamental rule of contract interpretation that the intention of the parties at the time of contract governs and that such intent must be ascertained from the entire instrument." *Vernon Twp. Volunteer Fire Dep't, Inc. v. Connor*, 855 A.2d 873, 879 (Pa. 2004). Therefore, "[i]n order to ascertain the intentions of the parties, restrictive covenants must be construed in light of: (1) their language; (2) the nature of their subject matter; (3) the apparent object or purpose of the parties; and (4) the circumstances or conditions surrounding their execution." *Id.*

With regard to any potential ambiguities, language in a restrictive covenant is ambiguous if it "is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Hutchinson v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (Pa. 1986). The question of whether an ambiguity exists cannot "be resolved in a vacuum." *Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (Pa. 1999). Instead, "terms are ambiguous if they are subject to more than one reasonable interpretation **when applied to a particular set of facts**." *Id.* (emphasis added). Stated differently, "whether the language of a[] [restrictive covenant] is clear and unambiguous may not be apparent without cognizance of **the context in which the agreement arose**." *Steuart v. McChesney*, 444 A.2d 659, 662

14

(Pa. 1982) (emphasis added); *see also Great Atl. & Pac. Tea Co.*, 220 A.2d at 2-3. In *Great Atlantic*, the Supreme Court held that the interpretation of a restrictive covenant is governed by "the intention of the parties **at the time the contract is entered into**" through examining the circumstances as they existed at the time of the execution. 220 A.2d at 2 (emphasis added). Indeed, "[s]ome of the surrounding circumstances always must be known before the meaning of the words can be plain and clear; and **proof of the circumstances may make a meaning plain and clear when in the absence of such proof some other meaning may also have seemed plain and clear**." *Steuart*, 444 A.2d at 661 (emphasis added) (quoting 3 Corbin, *Corbin on Contracts* § 542 (1960)). Finally, the Supreme Court explained that even assuming "that an ambiguity exists, it has long been the law that **the ambiguity in a restrictive covenant must be construed against the one to be benefited by the restriction**." *Great Atl. & Pac. Tea Co.*, 220 A.2d at 3 (emphasis added).

An example of reasonably interpreting a restrictive covenant in light of the particular facts presented and the context in which it arose, while also preserving the continuity of covenants that run with the land, is *Covey v. Gross*, 547 A.2d 1214 (Pa. Super. 1988).[13] That case involved a restriction that stated:

> The land herein conveyed shall be used for private residence purposes only and no building of any kind shall be erected thereon except private dwelling houses, each designed for occupancy by a single family and private garages for the sole uses of the respective owners or occupants of the lot upon which such garages are erected; provided further, that **no such private garages shall be erected on any lot unless a dwelling house shall be first erected upon the lot**, or shall have been erected simultaneously with the erection of such garage, nor shall any building be erected or constructed of cinder block or cement block unless such

---

[13]Although not binding, this Court may cite a decision of the Superior Court for its persuasive value. *Lerch v. Unemployment Comp. Bd. of Rev.*, 180 A.3d 545, 550 (Pa. Cmwlth. 2018).

> cinder block or cement block shall be faced with other material so that none of the said block is exposed in the exterior walls.

*Id.* at 1215 (emphasis added). When the owners of a dwelling on one lot wished to build a free-standing garage on the adjoining lot, a neighbor brought suit claiming that the restrictive covenant required the owners to first construct a separate dwelling on the adjoining lot. Looking to the parties' purpose behind the restrictive covenant, the court found that the restrictive covenant "was **obviously** intended to preserve the residential character of the neighborhood by requiring single-family residences and permitting garages only in connection with such residences." *Id.* at 1216 (emphasis added). Treating the two contiguous lots as one and, in light of the parties' intent behind the restriction and the context surrounding its execution, the court determined that this intent was not violated or impaired by the owners' use of the two contiguous lots for a single-family residence and unattached garage, nor did it place a burden on the neighbors. *Id.* The court cautioned that its holding did "not mean that if, in the future, the land . . . should be subdivided, the garage can then be maintained on a lot without a dwelling house" as **the restrictive covenant would continue to run with the land**. *Id.* The court held "only that the facts established in this case do not constitute a violation of the restriction." *Id.*

As in *Covey*, we examine the particular facts of this case and the context in which this 35-year-old restrictive covenant arose. The Note states: "Lots 1, 2 and 5 will not be sold prior to the installation of the proposed roadway shown hereon and the associated storm water management required to facilitate the roadway drainage in accordance with the latest . . . Township Zoning and Subdivision Ordinance." (R.R. at 218a.) There is no dispute that, as the Township Secretary testified, the purpose of the restriction was to provide the Lots with "access [to] the other properties," while the associated storm water improvements would prevent runoff

16

that could cause soil and erosion issues resulting from the construction of the roads.[14] (S.R.R. at 64b-65b.) The Township's Brief in Support of its Motion for Summary Judgment cites to this testimony as proof of the context in which this restrictive covenant arose. (R.R. at 155a.) Indeed, a review of the Subdivision Plan further confirms this purpose. The Lots are located on the edge of the Parcel, and one of the proposed roadways, running north to south, appears to bisect Lot Nos. 1 and 2 from Lot No. 5, while the other proposed roadway, running east to west, appears to bisect Lot No. 1 from Lot No. 2. (*Id.* at 217a-18a.) Considering the language of the Note, together with the testimony and the Subdivision Plan itself, it is evident that the reason for requiring the road, and thus the "the intention of the parties at the time the contract is entered into" was to provide the access to the Lots which would become necessary when the Lots were sold **separately** from the Parcel. *Great Atl. & Pac. Tea Co.*, 220 A.2d at 2. The storm water improvements would be required to mitigate any increased runoff resulting from the construction of the two roads. *See Cogan House Township v. Lenhart*, 197 A.3d 1264, 1268 (Pa. Cmwlth. 2018) (explaining that where a township engaged in alteration or development of land by performing modifications to a road, the township was required to implement measures to prevent injury from changes in runoff that might occur, as required by the Storm Water Management Act[15]).

In determining whether a transfer of the entire Parcel should be construed as the "sale of Lots 1, 2, and 5," which triggers the obligations in the Note, we examine the facts and context in which the Note arose and the parties' intention behind its inclusion. Transferring the entire Parcel as it has existed for the past 35 years to a

---

[14] We note that neither of the parties argue that there is any issue of material fact surrounding the Note's purpose that would preclude summary judgment.

[15] Act of October 4, 1978, P.L. 864, *as amended*, 32 P.S. §§ 680.1 – 680.17.

new owner would change only the name on the deed, but it would not create a need for access to the individual lots different than has existed. Further, the Subdivision Plan did not address the sale of the entire Parcel, including the Residue, which together form a large, **65-acre tract** of land; instead, by its terms, the Subdivision Plan applies **only** to the roughly **15 acres** contained in the Parcel. Importantly, the Note would continue to require the roads to be built **before** any sale of the Lots could occur. The Parcel would simply continue to exist in the same condition as it has for the past 35 years, while the only substantive change would be the name that appears on the deed.

Under the Township's and the trial court's interpretation, however, the Trust would be required to pave roadways to these 35-year-old paper Lots and make storm water improvements merely because of the transfer of the title to the Parcel. While it might be possible to interpret the language in the restrictive covenant, when considered in isolation, to require this, because the Trust's alternative interpretation is reasonable, the result would be that the Note is ambiguous. Because any "ambiguities in the language of [a restrictive] covenant are to be resolved in favor of the property owner," *Covey*, 547 A.2d at 1215, as it restricts, in this case, the owner's free alienation of its real property, *Lauderbaugh*, 186 A.2d at 41, the Note must be strictly construed against the Township and resolved in favor of the Trust. When strictly construed, this Note does not require the installation of roads and storm water improvements under these circumstances where this entire Parcel, including the paper Lots, along with the Residue, would be transferred to a new developer.

The Township's interpretation is not unlike the neighbors' interpretation of the restrictive covenant in *Covey*, 547 A.2d at 1215. The neighbors there did not

look to the purpose behind the restrictive covenant, seemingly examining the covenant in a vacuum to argue that the owners could not build a garage on the lot adjoining their dwelling without first building a wholly separate dwelling. Similar to the unreasonable nature of requiring a second dwelling to be built in *Covey*, under these facts and in this context, it is not reasonable to require the roads and associated storm water improvements to be installed here to simply transfer ownership of the entire Parcel. Importantly, like the restrictive covenant that continued to run with the land in *Covey*, the Note here **will continue to run** with the land binding any subsequent purchaser that desires to sell off the Lots separately from the Parcel in the future. *Doylestown*, 635 A.2d at 661.

## IV. CONCLUSION

In conclusion, considering the context in which this restrictive covenant arose, the most reasonable interpretation is that the Trust may transfer the Lots as part of the entire Parcel without first having to build a road and make the associated storm water improvements. Accordingly, we reverse the trial court's order granting the Township's Motion. We remand this matter with direction for the trial court to enter judgment in favor of Trustee.

 

**RENÉE COHN JUBELIRER,** Judge

19

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Barbara Gosselin, Trustee for       :
the Living Trust of Clarence         :
K. Shuey,                           :
                  Appellant    :
                           :
          v.              :    No. 531 C.D. 2018
                           :
The Supervisors of North Manheim  :
Township, Schuylkill County,     :
Pennsylvania                  :

## O R D E R

NOW, May 28, 2021, the order of the Court of Common Pleas of Schuylkill County is **REVERSED**. The matter is **REMANDED**, and the Court of Common Pleas of Schuylkill County is **DIRECTED** to enter judgment in favor of Barbara Gosselin, Trustee for the Living Trust of Clarence K. Shuey.

Jurisdiction relinquished.

_____
**RENÉE COHN JUBELIRER,** Judge

Barbara Gosselin, Trustee for the    :
Living Trust of Clarence K. Shuey,    :
            Appellant    :
    :
          v.    :
    :
The Supervisors of North Manheim    :
Township, Schuylkill County,    :   No. 531 C.D. 2018
Pennsylvania    :   Argued: November 13, 2019

BEFORE:   HONORABLE MARY HANNAH LEAVITT, President Judge
          HONORABLE RENÉE COHN JUBELIRER, Judge
          HONORABLE P. KEVIN BROBSON, Judge
          HONORABLE PATRICIA A. McCULLOUGH, Judge
          HONORABLE ANNE E. COVEY, Judge
          HONORABLE MICHAEL H. WOJCIK, Judge
          HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION NOT REPORTED

CONCURRING AND DISSENTING OPINION
BY JUDGE FIZZANO CANNON          FILED: May 28, 2021

      I agree with the majority's determination that the Supervisors of North Manheim Township, Schuylkill County, Pennsylvania (Supervisors) are not immune from the action brought by Barbara Gosselin, Trustee for the Living Trust of Clarence K. Shuey (Trustee), under the circumstances of this case. I therefore concur with that portion of the majority's opinion.

      However, I respectfully disagree with the majority's analysis and conclusion on the merits of this matter. Trustee, as successor-in-interest to Clarence

K. Shuey (Shuey), is bound by the Note added by the parties as a condition of the Supervisors' approval of Shuey's final subdivision plan (Plan) regarding development of five lots (Subdivision) within a larger tract of property (Property) Shuey owned in North Manheim Township (Township). Contrary to the majority's reasoning, the Note's restriction on the sale of Lots 1, 2, and 5 in the Subdivision as part of a sale of the Property, pending construction of the streets and stormwater management facilities shown in the Plan, accords with the provisions of the Township's subdivision ordinance, known as The North Manheim Township Subdivision Regulations (Ordinance),[1] both as of the time of the Plan approval and currently. The Note is an unambiguous condition of the Subdivision, and the Ordinance is equally unambiguous. Neither should be ignored or rewritten by this Court. Accordingly, I would affirm the order of the Court of Common Pleas of Schuylkill County (trial court) denying summary judgment in favor of Trustee and granting summary judgment in favor of the Supervisors.

Although "restrictive covenants are not favored by the law and are strictly construed against those seeking to enforce them, *they are legally enforceable*." *Doylestown Twp. v. Teeling*, 635 A.2d 657, 661 (Pa. Cmwlth. 1993) (emphasis added). As the majority correctly observes, Trustee does not question the Note's validity, only its meaning. *Gosselin v. Supervisors of N. Manheim Twp.* (Pa. Cmwlth., No. 531 C.D. 2018, filed May 28, 2021), slip op. at 10. The majority also correctly states that we must construe the Note in light of the circumstances surrounding its execution: "[r]estrictive covenants are construed in light of the subject matter, the intent or purpose of the parties and the conditions surrounding execution of the covenant." *Id.* (citing *Gey v. Beck*, 568 A.2d 672 (Pa. Super. 1990)).

---

[1] *See* The North Manheim Township Subdivision Regulations (Ordinance), § 1.1 (2010).

CFC-2

Under Subsection 508(4)(ii) of the Pennsylvania Municipalities Planning Code (MPC),[2]

> When an application for approval of a plat, whether preliminary or final, has been approved without conditions or approved by the applicant's acceptance of conditions, no subsequent change or amendment in the zoning, subdivision or other governing ordinance or plan shall be applied to affect adversely the right of the applicant to commence and to complete any aspect of the approved development in accordance with the terms of such approval within five years from such approval.

53 P.S. § 10508(4)(ii). Thus, the MPC "provides a developer a five-year window to develop an approved subdivision without compliance with subsequent changes in local ordinances that occur during that time." *Bd. of Supervisors v. Diehl*, 694 A.2d 11, 13 n.2 (Pa. Cmwlth. 1997). Where the developer fails to develop the property in compliance with the approved subdivision plan within five years after the plan's approval, development must comply with the requirements of the current subdivision ordinance. *Id.*; *see also Gallagher v. Chestnuthill Twp.*, 968 A.2d 253, 256 (Pa. Cmwlth. 2009) (under previous version of Section 508(4)(ii) of the MPC,[3] where developer did not install streets as shown in approved subdivision plan for over 20 years, development was subject to requirements of amended ordinance). Here, moreover, the Note provides: "Lots #1, #2 and #5 will not be sold prior to the installation of the proposed roadway shown hereon and the associated storm water management required to facilitate the roadway *with the latest North Manheim*

---

[2] Act of July 31, 1968, P.L. 805, *as amended*, 53 P.S. §§ 10101-11202.

[3] The previous version of Section 508(4)(ii) of the MPC contained the same language as the current version, except that it provided a three-year window rather than a five-year window after subdivision approval for completion of a development without a requirement of compliance with any amendments to the subdivision ordinance. *See former* 53 P.S. § 10508(4)(ii).

*Township Zoning and Subdivision Ordinance.*"[4]  (Emphasis added.)  This provision and Section 508(4)(ii) of the MPC both make the current Ordinance's requirements relevant to any construction of the Note.  However, in analyzing whether the Note is ambiguous, the majority fails to consider and apply any provisions of *either* the former or the current Ordinance.[5]  Considered in the context of both the former and current versions of the Ordinance, the Note's plain language unambiguously forbids *any* sale of Lot 1, 2, or 5 – whether separately or as part of a sale of the Property – until the roads required by the Plan, together with accompanying stormwater management, have been constructed in accordance with the latest Ordinance.

Both the former and current versions of the Ordinance define a "Subdivision" as including

> any development of a parcel of land (including industrial parks . . .), *which involves installation of streets* and/or alleys, even though the streets and/or alleys might not be dedicated to public use *and the parcel might not be divided immediately for purposes of conveyance, transfer, or sale,*

---

[4] The Amended Complaint purports to attach a full copy of the Plan, including the Note, as Exhibit D.  However, the attachment contained in the reproduced record (R.R.) is illegible.  *See* R.R. at 218.

[5] Of relevance here, Section 2.4 of the current Ordinance defines a "Lot" as "[a] tract or parcel of land, regardless of size, intended for transfer of ownership, use, or improvements or for development. *All new building lots shall have frontage on a public or approved private street*."  Ordinance, § 2.4 (emphasis added).  The former version of the definition of a "Lot" was the same, except that it did not include the italicized language.  *See* Suppl. R. at 3 (*former* Ordinance, § 2.4).

Section 5.521 of the current Ordinance, relating to lot frontage, provides:  "All lots shall have direct access to*, and have frontage on,* a public street existing or proposed, or to a private street if it meets the requirements of these regulations."  Ordinance, § 5.521 (emphasis added).  The former version of that provision was the same except that it did not include the italicized language.  *See* Suppl. R. at 39 (*former* Ordinance, § 5.521).

> *or even though the owner does not transfer legal or equitable title.*

Ordinance, § 2.4(d) (emphasis added); Suppl. R. at 7 (*former* Ordinance, § 2.4(d)) (emphasis added). Lots 1 through 5 were, therefore, created by Subdivision upon approval of the Plan. No additional division by deed or tax map was required to effectuate the Subdivision.

Moreover, the current and prior Ordinances define a "Lot" as "[a] tract or parcel of land, regardless of size, *intended for* transfer of ownership, use, or improvements or for development." Ordinance, § 2.4 (emphasis added). Regardless of whether they became separately deeded or identified as separate tax parcels, Lots 1, 2, and 5 were unquestionably "intended for transfer . . . or for development" at the time Shuey filed the Plan. *See id.* Therefore, contrary to Trustee's argument, Lots 1, 2, and 5 became "Lots" in the Subdivision within the meaning of both the former and current Ordinances when the Supervisors approved the Plan.

The current Ordinance, under which the Note requires that the roadway and stormwater management be facilitated, expressly states that "[a]ll new building lots shall have frontage on a public or approved private street." Ordinance, § 2.4; *see also id.*, § 5.521 ("[a]ll lots shall have direct access to, and have frontage on, a public street existing or proposed"). These road frontage requirements of Sections 2.4 and 5.521 were added to the Ordinance by amendment in 2006. *See* Ordinance, App. L; *compare* Ordinance, §§ 2.4 (definition of "Lot") & 5.521, *with* Suppl. R. at 3 (*former* Ordinance, § 2.4 definition of "Lot") & 39 (*former* Ordinance, § 5.521). Their addition further underscores the importance already placed by the Township and Supervisors on road access to subdivisions under the former Ordinance.

Both the former and current versions of the Ordinance also require that before an approved final subdivision plan may be recorded, the subdivider "shall

guarantee the installation of all required improvements" to the property, by either installing the improvements or posting a bond in the amount of 120% of the estimated cost of the improvements. Ordinance, §§ 3.911 & 3.912; Suppl. R. at 18-19 (*former* Ordinance, §§ 3.911 & 3.912). Notably, all improvements must be completed within one and one-half years from final subdivision plan approval, although the Supervisors may extend the deadline for a further one and one-half years.[6] Ordinance, § 3.912; Suppl. R. at 19 (*former* Ordinance § 3.912). A defaulting subdivider is liable to the Township for the cost of improvements that are not installed as provided in the approved final subdivision plan. Ordinance, § 3.912; Suppl. R. at 19 (*former* Ordinance § 3.912).

The Township's Planning Commission, with the Supervisors' approval, may modify the requirements of the Ordinance "conditionally in individual cases as may be necessary in the public interest, provided, however, that such variation shall not have the effect of nullifying the intent and purpose of" the Ordinance. Ordinance, § 8.2. As demonstrated by the various provisions cited above, one clear purpose of the current and prior Ordinances is to avoid the creation of subdivisions having any lots without direct street access. Thus, although the majority contends its reading of the Note is the more reasonable one, it has the necessary effect of violating Section 8.2 of the Ordinance by nullifying the Ordinance's purpose of assuring street access to all lots in every subdivision.

Importantly, even if the Note did not exist at all, Lots 1, 2, and 5 could not be sold until the street and stormwater management improvements were

_____

[6] Notably, the Plan was approved in 1986, and the Township did not amend the Ordinance until 2006. Although I do not believe the differences between the former and current versions of the Ordinance are determinative of any issue in this matter, I observe that had Shuey or his successor-in-interest complied with the Ordinance's deadline for completion of the improvements, no amendment to the Ordinance would be implicated here at all.

constructed or guaranteed. The current Ordinance provides that "*[n]o lot in a subdivision shall be sold . . .* until a [f]inal [p]lan of such subdivision shall have been approved and properly recorded *and until improvements have been either constructed or guaranteed.*"[7] Ordinance, § 8.51 (emphasis added); Suppl. R. at 53 (*former* Ordinance, § 8.51) (emphasis added). Despite these stringent requirements of the Ordinance prohibiting the sale of any lots of a subdivision without installation of the roadway and stormwater improvements, there is no dispute that Lots 1, 2, and 5 currently have no frontage on a public or approved private street. *See Gosselin*, slip op. at 3. Rather, the installation of the streets and stormwater management facilities has been neither completed nor guaranteed.

The Note's restriction on the sale of Lots 1, 2, and 5 furthered the purpose of the prior and current Ordinances. Shuey obtained approval of the Plan and permission to sell Lots 3 and 4 immediately, conditioned on the future installation of streets to provide access to Lots 1, 2, and 5. He agreed to that condition, and in return, the Supervisors deviated from the normal requirement of the Ordinance that would have compelled Shuey to install the streets providing access to Lots 1, 2, and 5, or post a bond in the amount of 120% of their cost, before selling *any* of the lots. Shuey thereby enjoyed the advantage of selling Lots 3 and 4, which had road frontage, without the necessity of first providing road access to the remaining lots. In these circumstances, the clear meaning and intent of the Note added to the Plan was to make sure that road access to Lots 1, 2, and 5, which is expressly required by the Ordinance, would be provided for those lots by the

---

[7] The mandatory nature of this requirement is underscored by the provision that "[a]ny subdivider who . . . sells, leases, transfers or agrees to enter into an agreement to sell . . . any lot . . . in a subdivision without first having complied with all the provisions of this ordinance shall be guilty of a misdemeanor." Ordinance, § 8.52.

subdivider. Under the Ordinance, Lots 1, 2, and 5 are already individual lots and are part of a Subdivision under the Plan, even though the streets have not been constructed and the lots have not been sold individually. Accordingly, the street access requirement of the Ordinance remains applicable. However, because neither Shuey nor Trustee as his successor-in-interest ever complied with the street installation requirement, Lots 1, 2, and 5 lack street access, in defiance of both the Ordinance and the Plan.

Significantly, there is a proper municipal process in place to accomplish what the majority has improperly approved by its decision to modify the plain meaning of the Note on the Plan and ignore the terms of the Ordinance. The Ordinance provides a specific procedure for a re-subdivision to alter the configurations of lots in a previously approved subdivision plan. To make any change to lot lines in an approved subdivision plan, the subdivider must submit the previously recorded plan to the Township Planning Commission and the Supervisors and obtain their endorsements of the changes, which must be recorded on the plan. Ordinance, §§ 3.102 & 3.1021. However, re-subdivision is "limited to changes in lot lines on the approved [f]inal [p]lan . . . "; any other changes, like removing a condition of approval, are "considered as constituting a new subdivision of land" and must comply with the Ordinance's subdivision requirements. *Id.*, § 2.4. As relevant here, lot line changes by re-subdivision on a recorded plan may not alter street locations shown on the plan, and any resulting lot must still "abut an existing or a proposed street." *Id.*, §§ 3.101, 3.1013 & 3.1014.

Thus, even if Trustee would be entitled to a re-subdivision removing the lot lines of Lots 1, 2, and 5 in order to sell those lots as part of the Property, the Ordinance provides that the re-subdivision could not alter the existing street

locations.  In order to alter, *i.e.*, remove the existing street requirements, Trustee would have to submit and obtain approval of a new subdivision plan.  Notably, any application for either a new subdivision plan or a re-subdivision would have to demonstrate that the Property, including Lots 1, 2, and 5, has direct street access with road frontage in compliance with the requirements of the Ordinance both before and after the dissolution of the lot lines of Lots 1, 2, and 5.  Trustee has not submitted any such plan or application.

A new subdivision plan could have sought to remove the existing Note and dissolve the lines forming Lots 1, 2, and 5, combining that land with the residue of the Property.  *See* Amended Complaint, Ex. D.  This would require, under the current Ordinance, street and stormwater improvements extending the existing road (currently serving lots 3 and 4) to access one large lot instead of four, which would predictably be much less costly.  This, of course, would mean that the Trustee would lose the identity of Lots 1, 2, and 5 as lots and approval of another new plan by the Township would be necessary in the event that a future owner should desire to restore those lots.  However, rather than upholding the requirement of such applications for re-subdivision or new subdivision before the Township as required by the Ordinance, the majority declares the Note ambiguous, concluding that the Note did not really mean its actual statement that Lots 1, 2, and 5 cannot be sold until roads and stormwater management facilities are installed, but rather, that the sale of the Lots and the remaining Property can take place as long as they are sold together, regardless of what both the Ordinance and the Note require.

Further, the addition of the Note was a condition of approval of the Plan to which the applicant, Shuey, agreed.  If a governing body imposes a condition that a subdivision applicant finds unacceptable, the applicant has the right to refuse the

condition and appeal the denial of the application, but he must appeal within the time prescribed by statute. *Bonner v. Upper Makefield Twp.*, 597 A.2d 196, 200 (Pa. Cmwlth. 1991) (citing Section 1002-A of the MPC,[8] 53 P.S. § 11002-A). "The subdivider's failure to object to [] conditions constitutes a waiver of the right to seek review." *Doylestown*, 635 A.2d at 660 (where township waived some subdivision ordinance requirements in reliance on subdivider's acceptance of conditions, and subdivider did not appeal or object to those conditions, the conditions ran with the land and were binding on successors in interest) (citing *Bonner*, 597 A.2d 196).

Here, the subdivider, Shuey, could have rejected the condition imposed by the Note and appealed a denial of the subdivision or timely objected to the condition. He did neither. He took advantage of the approved Plan and, for himself and the beneficiaries of his trust, reaped the financial benefit of the Plan by selling Lots 3 and 4, the only lots with road access, without first assuring road access to the remaining Lots 1, 2, and 5. Importantly, again, even if the Note had not been agreed to and did not appear on the Plan, the Ordinance requires that the road and storm water improvements were required to be constructed or guaranteed before the lots could be sold. *See* Ordinance, § 8.51; Suppl. R. at 53 (*former* Ordinance, § 8.51).

Now, in avoidance of the Ordinance, Trustee seeks to rescind a term upon which the approval of the creation of all of the lots, including Lots 3 and 4, was conditioned. Trustee could have applied for a new subdivision plan reversing or extinguishing the existing Plan and combining Lots 1, 2, and 5 with the residue of the Property for sale. She did not do so. Instead, Trustee seeks to have her proverbial cake and to eat it, too. Trustee wishes to avoid the expense required to

---

[8] Added by the Act of December 21, 1988, P.L. 1329.

complete improvements necessary for the sale of the additional lots, while retaining the separate identity (and value) of Lots 1, 2, and 5 as subdivided lots for future sale.

"A restrictive covenant is a restriction in an instrument relating to real estate by which the parties pledge that something will not be done." *Doylestown*, 635 A.2d at 661 (citing Black's Law Dictionary 329 & 1182 (5th ed. 1979)). Restrictive covenants properly impose restrictions and limitations on property. *See Bonner*, 597 A.2d at 199 (a governing body has the power to impose conditions on the approval of a subdivision and to approve a plan subject to conditions only if the conditions are accepted by the applicant). "Such covenants are said to run with the land, when not only the original parties or their representatives, but each successive owner of the land, will be entitled to its benefit, or be liable (as the case may be) to its obligation." Black's Law Dictionary 329 (5th ed. 1979). The majority is willing to disregard the terms of the Ordinance and an unambiguous agreed-to condition of the Plan using the justification that the roadway installation requirement will continue to run with the land if Trustee sells Lots 1, 2, and 5 along with the remainder of the Property. The point of the Note and the Township Ordinance, which require the installation of the roadway or guarantee of such installation by the subdivider, is to make sure that the person or entity benefitting from the subdivision, the applicant whose application has been approved, is the one who is financially responsible for such improvements. This allows the Township to be certain the improvements will be completed and to know who will be responsible for their completion. If the improvements are not installed or guaranteed by the subdivider, the Township can install the improvements itself and charge the cost to the subdivider under the Ordinance. *See* Ordinance, §§ 8.55 (the Supervisors may take "action necessary to prevent or remedy any violation" of the Ordinance), 3.912 & Suppl. R. at 19 (*former*

Ordinance § 3.912) (a defaulting subdivider is liable to the Township for the cost of improvements that are not installed as provided in the approved final subdivision plan).

Restrictive covenants cannot simply be ignored because compliance is difficult or burdensome with the passage of time. *See Ciavarella v. Wright Twp. Planning Comm'n* (Pa. Cmwlth., No. 210 C.D. 2008, filed Feb. 6, 2009), slip op. at 8, 2009 Pa. Commw. Unpub. LEXIS 249 at *13 (unreported) ("a new owner may not simply ignore obligations noted in a prior, approved subdivision plan"; where original subdivider did not challenge the condition imposed by a note, that condition remained a valid limitation running with the land, and any further subdivision was contingent upon the road improvements set forth in the original subdivision plan).[9] "One seeking release from a covenant has the burden of proving that the original intention and purpose of the restriction has been altered or destroyed by changed conditions." *Doylestown*, 635 A.2d at 661 (citing *Rieck v. Va. Manor Co.*, 380 A.2d 375 (Pa. Super. 1977)). The only changed condition here is that Trustee does not want to invest what it would cost to uphold the covenant.

Notably, the majority fails to recognize that, as explained above, the Note is actually *less* restrictive than the Ordinance, in that the Note allowed Shuey to sell Lots 3 and 4 without first installing all of the roads and stormwater facilities required for the Subdivision, as the Ordinance otherwise required. Thus, the majority fails to consider that *Shuey, not the Township, was the party benefitted* by the addition of the Note to the Plan. Even if the Note is viewed as restrictive, it was a condition of the Plan, agreed to when the Subdivision was created; its clear purpose

---

[9] Unreported opinions of this Court may be cited as persuasive authority pursuant to our Internal Operating Procedures. 210 Pa. Code § 69.414(a).

was to ensure the installation of the roads and required stormwater management improvements by the subdivider, consistent with the Ordinance. Trustee cannot sell Lots 1, 2, and 5 in defiance of the Note and Ordinance. Further, it is not for this Court to remove or modify the Note or the Ordinance. Doing so ignores the municipal process the Township has put in place for altering the Plan or relaxing any requirement of the Ordinance.

While I disagree with the majority's suggestion that the Note is ambiguous, I observe that even if an ambiguity existed, it would require this Court to vacate the trial court's summary judgment order and remand for evidence and findings of fact concerning the parties' object or purpose in agreeing to the Note, as well as the circumstances or conditions surrounding its addition to the Plan. *See MCI Worldcom Commc'ns, Inc. v. Pub. Util. Comm'n*, 826 A.2d 919, 924-25 (Pa. Cmwlth. 2003) (observing that whether language of an agreement is ambiguous is a question of law, but if it is ambiguous, its meaning is determined by the surrounding facts and circumstances, which is a decision for the trier of fact; vacating and remanding for findings of fact concerning parties' intent). Although the majority concedes those issues must be considered in construing an ambiguous provision, they are not developed in the record here. Therefore, those issues are not proper subjects of summary judgment if the Note is ambiguous. The majority, however, sidesteps the paucity of the record on those issues and simply concludes that any ambiguity must be construed against the Township.

Lastly, the purchasers of Lots 3 and 4 were entitled to rely upon the recorded Plan, the Note and the Ordinance when they purchased their lots as part of the Subdivision, which included Lots 1, 2, and 5. It is of no moment that the required roads and improvements may not directly service or have a direct impact on Lots 3

CFC-13

and 4. Lots 3 and 4 were sold as part of the Subdivision that included five lots, three of which were to be serviced by two new roads. The purchasers of Lots 3 and 4 had a right to purchase in reliance on the recorded Plan. Although they have not intervened in this present matter, they are affected third parties who have the option of enforcing the Plan in a separate action. *Doylestown*, 635 A.2d at 661.

Because the Note and the Township Ordinance require construction of roads and stormwater management before *any* sale of Lots 1, 2, and 5 and are enforceable against Trustee by the Supervisors,[10] I, respectfully, dissent.

_____
CHRISTINE FIZZANO CANNON, Judge

Judge Covey joins this minority opinion.

---

[10] The Ordinance expressly authorizes the Supervisors to "initiate and maintain civil action . . . [t]o obtain a writ of injunction against the owner . . . who attempts the improper sale of [sic] conveyance of land." Ordinance, § 8.54.a. *See also Doylestown*, 635 A.2d at 660 ("a municipality may sue in equity to enjoin violation of a condition attached to a subdivision approval"). The Ordinance also empowers the Supervisors to take "such other action necessary to prevent or remedy any violation" of the Ordinance. *Id.*, § 8.55. A subdivider who sells or agrees to sell any lot in a subdivision without first complying with all requirements of the Ordinance is also subject to monetary penalties. *Id.*, §§ 8.52 & 8.53.